UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DANIEL W. COUNCIL**,                           Case No. 5:12 CV 1407

       Plaintiff,                           Judge Solomon Oliver, Jr.

   v.                                     REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

       Defendant.                          Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Daniel W. Council seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). This case was referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 5, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision.

## BACKGROUND

Procedural History

On March 6, 2009, Plaintiff filed applications for SSI and DIB, stated he was disabled due to paranoid schizophrenia, and alleged a disability onset date of January 1, 2008. (Tr. 112, 116, 141). His claims were denied initially (Tr. 59, 62) and on reconsideration (Tr. 76, 79). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 82). Born January 17, 1972, Plaintiff was 38 years old when the hearing was held on December 23, 2010. (Tr. 21, 112). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 15–16, 21–51).

Vocational History and Agency Contacts

     Plaintiff graduated from high school in 1990, worked as an assembler from 1990 to 2005, and worked as a security guard in a nursing home from February 2007 to November 2008. (Tr. 142, 146, 213). In a number of contacts with agency adjudicators, he was combative and irritable. On March 6, 2009, Plaintiff was upset and "appeared to be in need of mental health attention." (Tr. 139). On March 24, 2009, Plaintiff said he did not feel he needed to attend a consultative examination. (Tr. 148). He was advised the law required his current condition to be assessed, particularly because he had not been in treatment. (Tr. 148). Plaintiff was sarcastic and said he would ask his attorney about it being the law, but he agreed to make the appointment. (Tr. 148). In an April 2009 communication, Plaintiff was "very short" with the adjudicator and "wanted to be sarcastic and snide". (Tr. 149). He said he had been in several car accidents and thought his pain kept him from working, explaining he had treated with a chiropractor. (Tr. 149). Plaintiff repeatedly asked about the status of his case, seemed "to want to incite a verbal debate" with his adjudicators, and later said back pain was "only a small part" of why he could not work. (Tr. 150, 152). After he reported his condition had worsened, he kept interrupting the adjudicator who called for clarification and could not answer how his condition had worsened. (Tr. 162). Plaintiff would not agree to a consultative examination, was extremely argumentative, and would not answer questions. (Tr. 162).

     In his disability report, Plaintiff said paranoid schizophrenia made him feel anxious, explaining he suffered from auditory and visual hallucinations. (Tr. 141, 156). According to Plaintiff, his hallucinations prevented him from caring for himself. (Tr. 159). He said he had tried to work part time but was fired in November 2008 when his position was eliminated. (Tr. 141). Plaintiff said he was not sure if he needed medication, but would take it if a doctor prescribed it. (Tr.

147). Later, Plaintiff said his condition worsened and he was hospitalized due to "stress on heart". (Tr. 159, 167). Plaintiff refused to fill out a function report. (Tr. 209, 235).

Medical History

Despite alleging he became disabled in 2008, Plaintiff's medical records largely documented hospitalizations in the 1990s. In March 1993, Plaintiff was hospitalized and tentatively diagnosed with an acute psychotic episode and paranoid schizophrenia. (Tr. 173–74, 177). His mother reported he experienced increased restlessness, confusion, diarrhea, and increased urination and lost control of his behavior, at which point he "began running through the house trying to get out." (Tr. 175). At the time he was admitted, Plaintiff was psychotic with delusional thoughts and fear of the environment, along with some paranoia. (Tr. 184). Physicians could not perform a physical examination due to his agitation. (Tr. 175). He became non-communicative and went into a seizure-like state in response to questioning. (Tr. 175). Additionally, he was paranoid and combative and believed people were after him. (Tr. 178). A neurological consult was ordered and the neurologist noted Plaintiff had been admitted for similar symptoms about a year earlier. (Tr. 179–80). He believed the psychotic behavior was not organically based, but ordered an EEG and CT. (Tr. 180).

Plaintiff also underwent an occupational therapy initial psychiatric assessment while hospitalized. (Tr. 183). He refused to participate with simple tasks requested of him and a self-assessment. (Tr. 183). Dr. Rajiah's discharge summary stated physical examination revealed no abnormality. (Tr. 184). He noted Plaintiff became reluctant to take medication, was suspicious and guarded, showed poor insight and judgment, and refused certain lab work, including the recommended EEG and CT scan. (Tr. 185). Plaintiff left the hospital with his mother, against medical advice. (Tr. 185). He was not considered dangerous, but Dr. Rajiah thought Plaintiff could

3

have stayed for further improvement of his mental status. He was not given any prescriptions, and he was advised to go to Peers if there were further problems. (Tr. 185).

Another record of a psychiatric examination[1] noted Plaintiff was admitted due to violent hallucinations, explaining he experienced a personality change and became violent and destructive before being taken to the emergency room, where he was found too combative to be kept and was transferred to Peers. (Tr. 186). He was described as volatile and erratic and diagnosed with lack of impulse control and psychosis. (Tr. 187).

Plaintiff was hospitalized again between April 26, 1996 and May 3, 1996 and diagnosed with paranoid schizophrenia and borderline mental retardation. (Tr. 193). Dr. Rejdev K. Grewal stated he had treated Plaintiff since his 1993 hospitalization, noting Plaintiff had been taking antipsychotic medications but recently had cut back on them. (Tr. 193). This led to increased suspicions, paranoid behavior, and communication problems. (Tr. 193). Dr. Grewal also stated Plaintiff lived with his mother and had never been able to hold a job. (Tr. 193). On examination, Plaintiff was mistrustful, suspicious, and preoccupied. (Tr. 193). He avoided eye contact, fidgeted, appeared anxious and ambivalent, and was unresponsive to questions and almost catatonic. (Tr. 193). Plaintiff reported decreased sleep and appeared to have auditory hallucinations but refused to share what he heard. (Tr. 193). A consulted psychologist assigned Plaintiff an IQ of 72, placing him in the borderline range, and said Plaintiff also had a thought disorder. (Tr. 193). He was given daily psychotherapy and group therapy, but participated only minimally. (Tr. 193). At discharge, he had improved and was prescribed antipsychotic medication and instructed to follow up in one month. (Tr. 194).

---

1. The record is not dated, but may have been related to his 1993 hospitalization because it was included in the exhibit with those records and documented similar symptoms.

Plaintiff presented to the emergency room again in November 1998 and complained of sweating hands and feet. (Tr. 195). Although he said he had been taking his antipsychotic medications, his mother informed the nurse he had not. (Tr. 195). Plaintiff was comfortable, quiet, and cooperative; was not suicidal, homicidal, or psychotic; and did not exhibit any psychiatric signs or symptoms. (Tr. 195). He was instructed to follow up with his personal doctor. (Tr. 195).

Chiropractor Dr. Gary J. Minorik treated Plaintiff for back and neck pain between April 3, 2008 and June 4, 2008. (Tr. 237–38). Plaintiff initially presented with pain in his neck, lower back, and middle back, along with muscle spasms. (Tr. 238). A year passed between the last time he saw Plaintiff and the time he filled out a form regarding his functioning, so Dr. Minorik could not specify Plaintiff's current condition. (Tr. 238). He noted Plaintiff achieved 80 percent to 90 percent improvement by the time he left treatment. (Tr. 238).

On November 20, 2008, state agency psychologist Dr. Karla Voyten stated there was insufficient evidence of any mental impairment, noting Plaintiff alleged schizophrenia and wanted a decision made on the evidence in his file but was not in mental health treatment. (Tr. 197, 209). She also reported Plaintiff did not want to attend the psychological consultative examination, asked to cancel it, and declined to complete a form regarding his daily function. (Tr. 209).

Plaintiff ultimately did attend a psychological consultative examination with Dr. Sudhir Dubey on April 15, 2009. (Tr. 212). He drove himself to the appointment and was on time. (Tr. 212). Plaintiff reported he had a good relationship with his siblings and said he had been dating for a year and a half, was satisfied with the relationship, and had a good relationship with his three children. (Tr. 212–13). He was living alone in a rented home and said he met his financial needs with support from others and unemployment payments. (Tr. 213). Plaintiff also reported his girlfriend, a friend,

5

and his mother provided socialization and emotional and financial support. (Tr. 213). He said he had nerve damage in his neck and back due to a car accident ten months earlier. (Tr. 213). Plaintiff reported past psychiatric treatment for schizophrenia, including medication and therapy but denied current psychiatric care. (Tr. 213). Plaintiff told Dr. Dubey he cooperated with his prior treatment and it did not affect or cause withdrawal from work. (Tr. 213). Further, he said he was not currently taking medication. (Tr. 213). Plaintiff did not report issues dealing with others and specifically said his mental and physical conditions did not affect his employment, stating he had no difficulty retaining employment; yet, contradicting himself, he also said his current psychological symptoms affected his ability to work. (Tr. 213).

Dr. Dubey described Plaintiff as consistent, credible, and reliable, with appropriate hygiene and grooming, normal mannerisms, and no unusual gestures. (Tr. 214). Plaintiff denied high-risk behavior. (Tr. 214). His facial expressions were alert and tense, his behavior appeared irritable and negativistic, and he was tense but cooperative. (Tr. 214). Plaintiff's speech was coherent, with a logical progression of goals to ideas. (Tr. 214). His affect was appropriate, but his emotional reactions were irritable. (Tr. 214). He reported a history of mood swings and symptoms consistent with mild depression, noting he felt discouraged about his work situation and experienced anxiety and panic attack symptoms in crowds and public places. (Tr. 214). He said his typical day included activities such as cooking, cleaning, doing laundry, watching television, and reading. (Tr. 215). Additionally, Plaintiff reported he could do chores, perform personal hygiene adequately and independently, drive, shop, and manage money. (Tr. 215). He said he spent time with friends on a limited basis, played basketball, and went for walks. (Tr. 215). Plaintiff said he had been getting progressively worse, resulting in an inability to work outside the home and decreased socialization.

(Tr. 215). He denied recurrent traumatic memories, delusions, hallucinations, depersonalization, obsessions, or compulsions. (Tr. 214).

Dr. Dubey opined Plaintiff could make important decisions affecting his future, his overall cognitive functioning was in the low-average range, and he had a Global Assessment of Functioning (GAF) score of 60.[2] (Tr. 214–16). He noted "[Plaintiff] indicated that he had issues with paranoid schizophrenia; however, did not acknowledge any items that would be consistent with that diagnosis". (Tr. 216). Dr. Dubey diagnosed anxiety disorder, not otherwise specified. (Tr. 216). He found Plaintiff mildly impaired in understanding, remembering, and follow instructions; maintaining attention, concentration, persistence, and pace to perform simple repetitive tasks; and relating to others. (Tr. 216–17). Dr. Dubey opined Plaintiff's mental ability to withstand the stress and pressure of daily work was moderately impaired, but found he had the mental ability to manage his own funds. (Tr. 217).

On April 27, 2009, Dr. Leslie Rudy completed a psychiatric review technique form, noting Dr. Dubey's findings with regard to limitations. (Tr. 218, 228). In a mental residual functional capacity (RFC) assessment, Dr. Rudy found Plaintiff not significantly limited in most areas of functioning and no evidence of limitation in many other areas, but she found him moderately limited in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest breaks. (Tr. 233). Dr. Rudy noted Plaintiff had previously been awarded disability in 1994 but

---

2. A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).

subsequently worked as an assembler and security guard. (Tr. 234). He felt he had been penalized for trying to work and said he did not take medications while he was working. (Tr. 234). Dr. Rudy also noted Plaintiff did not take medication currently, did not know if he needed it, and was not in mental health treatment. (Tr. 234). Dr. Rudy noted Plaintiff's daily activities as reported at the consultative examination and concluded Plaintiff retained the capacity for a variety of work tasks in a setting without fast-paced or high production demands, stating he could interact appropriately and adapt to routine changes. (Tr. 235).

On September 30, 2009, Dr. Joan Williams affirmed Plaintiff's mental RFC, noting Plaintiff's mental health status was "without significant known change since [the] initial level mental evaluation" and he had declined the opportunity for an additional consultation to address his allegedly worsening symptoms. (Tr. 242). Additionally, she stated Plaintiff could not articulate how his conditions had worsened and denied seeing new doctors, providing only information on his 1993 hospitalization for an acute psychotic episode. (Tr. 242).

Plaintiff saw psychologist Dr. Ramone Ford one time on November 6, 2009. (Tr. 243). His mood was euthymic, his thoughts were clear and coherent, he was fully oriented, and he denied suicidal or homicidal ideation. (Tr. 243). After one appointment, Plaintiff did not return to therapy and did not respond to outreach. (Tr. 243). His discharge diagnoses were adjustment reaction disorder not otherwise specified, personality disorder not otherwise specified, alcohol abuse unspecified, and cannabis abuse unspecified. (Tr. 243).

ALJ Hearing

Though proceeding *pro se* in this appeal, Plaintiff was represented by counsel at his ALJ hearing. (Tr. 21). Plaintiff testified he worked at a security company in 2008, denied a history of

8

drug or alcohol problems, and said he could drive. (Tr. 26–27). He testified he lived in a house with his mother and had been receiving unemployment until about a month before his hearing. (Tr. 27–28). Plaintiff then testified he engaged in absolutely no activities on a daily basis, saying his mother cooked for him and he watched television. (Tr. 28–29). However, he also testified he read, went to stores, spent time with his children and their mother several times a week, and talked to friend on the phone. (Tr. 29, 31–32, 36). Once again contradicting himself, Plaintiff testified he never visited people, found it hard to interact with people, and had trouble understanding and focusing. (Tr. 30–31). Later, he testified he had trouble getting along with people at previous jobs. (Tr. 36–40).

Plaintiff explained that despite previously receiving social security disability payments, he "took it upon [him]self to . . . try to work" because he felt good while taking his medications. (Tr. 32). He said his job caused stress, resulting in his 1998 hospitalization, and reported he continued having problems after that. (Tr. 32). Plaintiff admitted he was not in treatment for his conditions, explaining he went to one counseling session. (Tr. 33–34). He said he could not work due to stress, agitation, and mood swings. (Tr. 33). He testified his mother and family gave him a lot of support, noting he had trouble trusting people and needed support to take his medication, but admitted he was not currently taking medication. (Tr. 35). Plaintiff said he had panic attacks in large crowds and tried to avoid scenarios that would trigger panic attacks, noting assembly line jobs had caused them in the past. (Tr. 42–43). The ALJ asked Plaintiff if anything else limited his ability to work, and he said "no", adding he did not like to be ignored, treated like a child, or intimidated. (Tr. 43–44).

Asked to consider a person limited to simple, routine, repetitive tasks performed in an environment free of fast-paced production requirements, with only simple work-related decisions

9

and routine workplace changes, who could have only occasional interaction with the public, supervisors, and coworkers, the VE testified such a person could not perform Plaintiff's past work but could perform many other jobs. (Tr. 46–47). These included but were not limited to hand packager, laundry laborer, and assembler of small products. (Tr. 46). If the person could have only superficial and no direct interaction with the public, and only superficial interaction with supervisors and coworkers, the VE eliminated the laundry laborer job but said the others would remain. (Tr. 48). Further, he stated such a person could also work as an assembler of electrical accessories, along with other jobs. (Tr. 48). If the person could have no direct interaction with supervisors or coworkers, he would not be able to maintain employment. (Tr. 49–50).

ALJ Decision

After finding Plaintiff had not engaged in substantial gainful activity since his alleged onset date and noting the date last insured was December 31, 2013, the ALJ found Plaintiff had one severe impairment – anxiety disorder – and the non-severe impairments of neck and back problems. (Tr. 10). The ALJ then found these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11). He found Plaintiff mildly restricted in activities of daily living and social functioning but moderately limited with regard to concentration, persistence, or pace. (Tr. 11). Explaining, the ALJ noted Plaintiff admitted he could perform a number of daily activities, drive, manage his money, go shopping, play basketball, date, maintain good relationships with his children and their mother, and socialize with friends. (Tr. 11). However, the ALJ acknowledged Plaintiff had experienced interpersonal problems on the job in the past. (Tr. 11). Considering the evidence, the ALJ found Plaintiff retained the RFC

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, repetitive tasks performed in an

>environment free of fast-paced production requirements; simple, work-related decisions and routine workplace changes; and occasional interaction with the public, supervisors, and coworkers.

(Tr. 12).

Specifically, the ALJ noted that despite Plaintiff's complaints that auditory and visual hallucinations prevented him from caring for himself, he denied hallucinations during his consultative examination and Dr. Dubey did not find Plaintiff's presentation consistent with a diagnosis of paranoid schizophrenia. (Tr. 12–13). Additionally, the ALJ noted Plaintiff had a euthymic mood with clear and coherent thoughts and did not complain of hallucinations when he saw Dr. Ford in 2009. (Tr. 13). The ALJ reviewed Plaintiff's lack of mental health treatment during the period of alleged disability, acknowledging Plaintiff's failure to return to Dr. Ford and lack of medications. (Tr. 13). He also drew attention to Plaintiff's daily activities and the fact that Plaintiff quit working in November 2008 because the employer eliminated his position, not due to his mental impairment. (Tr. 13). Thus, the ALJ questioned "whether [Plaintiff] would have continued to work had he not been let go." (Tr. 13). Based on VE testimony, he found Plaintiff could not perform his past relevant work but could perform other jobs existing in significant numbers in the national economy. (Tr. 14–15). Therefore, he found him not disabled. (Tr. 15). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Striving to afford this *pro se* litigant latitude in construing the arguments he presents, the undersigned interprets his Motion as arguing the ALJ improperly assessed his credibility and substantial evidence does not support the ALJ's RFC determination or conclusion finding Plaintiff not disabled, also addressing the fact that Plaintiff alleged schizophrenia but the ALJ failed to list it as a severe or non-severe impairment. Because substantial evidence supports all the ALJ's conclusions, the Court should affirm the Commissioner's decision denying benefits.

<u>Credibility and Severe Impairments</u>

The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375

F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of his alleged symptoms were not credible because they were inconsistent with the medical

14

evidence, his testimony, and his daily activities. (Tr. 12–13). Substantial evidence supports this conclusion. Though he treated mental health conditions including paranoid schizophrenia in the 1990s, during the period relevant to this disability determination, Plaintiff did not take medication, attended only one counseling session in November 2009 (at which his presentation was unremarkable), and tried to refuse a consultative examination, asking instead for the determination to be made on his old records. (Tr.147–48, 162, 209, 213, 242–43).

When he did attend the consultative examination, Plaintiff said his conditions had not caused him to leave his job in 2008; denied delusions or hallucinations; did not report issues dealing with others; said he had good relationships with his siblings, children, girlfriend, and a friend; and stated he performed daily activities such as cooking, cleaning, doing laundry, watching television, reading, driving, shopping, playing basketball, and going for walks. (Tr. 212–15). Plaintiff refused to complete a function report (Tr. 162, 209), and – entirely inconsistent with his reports to Dr. Dubey – at the ALJ hearing he said he engaged in absolutely no activities other than watching television. (Tr. 28–29). Contradicting himself once again, later in the hearing Plaintiff said went to stores, drove, occasionally read, spent time with his children and their mother several times a week, and talked to a friend on the phone. (Tr. 29, 31–32, 36).

To say Plaintiff's treatment was conservative during the time he alleged disability would vastly overstate the treatment he received during the relevant time frame. He did not take medication, attempted to avoid a consultative examination, and saw one psychologist one time for counseling, after which he never returned and did not respond to the psychologist's attempts to reach him. (Tr. Tr.147–48, 162, 209, 213, 242–43). He continually contradicted himself and the record showed he had good social relationships and could care for himself and visit his children regularly.

15

(Tr. 28–29, 31–32, 36, 213–15). This provides substantial evidence supporting the ALJ's conclusion finding Plaintiff not credible regarding his symptom-severity.

At step two of the disability analysis, the ALJ has an obligation to determine whether a claimant suffers a "severe" impairment – one which substantially limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009). But the regulations do not require the ALJ to designate each impairment as "severe" or "non-severe"; rather, the determination at step two is merely a threshold inquiry. 20 C.F.R. § 404.1520(a)(4)(ii). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat*, 359 F. App'x at 576 (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis in original). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider all the limitations caused by the claimant's impairments, severe or not. And when an ALJ considers all a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Plaintiff alleged he was disabled due to paranoid schizophrenia, much later adding to a consultative examiner that he thought back and neck pain also limited his ability to work. (Tr. 141, 213). The ALJ found Plaintiff suffered from one severe impairment – anxiety disorder. (Tr. 10). Because Plaintiff was never diagnosed with or treated for paranoid schizophrenia during the alleged period of disability, the ALJ did not err in failing to find it was a severe impairment. Moreover, he considered Plaintiff's alleged symptoms of hallucinations preventing him from caring for himself,

16

but found these not credible. (Tr. 12–13). And rightly so. Plaintiff did not complain of hallucinations at his one counseling session with Dr. Ford, his thoughts were clear and coherent, he had a euthymic mood, he was fully oriented, and he denied suicidal or homicidal ideation. (Tr. 243). At the consultative examination with Dr. Dubey, Plaintiff expressly denied delusions and hallucinations. (Tr. 214). He did not treat his mental disorder with counseling or medication, did not know if he needed medication, and did not leave his long-term job because of his psychological conditions. (Tr. 141, 147–48, 162, 209, 213, 242–43). Because the ALJ considered Plaintiff's alleged symptoms, found them not credible, and nevertheless limited Plaintiff to pace restrictions and only occasional interaction with others, he did not err in failing to find paranoid schizophrenia was a severe impairment.[3]

RFC Determination

The ALJ determined Plaintiff could perform a full range of work at all exertional levels, but due to mild difficulties in social functioning and moderate difficulties maintaining concentration, persistence, and pace, he limited Plaintiff to simple, routine, repetitive tasks, with no fast-paced production requirements, simple work-related decisions, routine workplace changes, and only occasional interaction with the public, supervisors, and coworkers. (Tr. 12). As already discussed at length, Plaintiff's record did not establish disabling symptoms. But for one counseling session in late 2009, he did not treat his alleged symptoms during the relevant time frame, denied most symptoms during the consultative examination, enjoyed supportive social relationships, could care

---

3. Neither did the ALJ err in assessing Plaintiff's neck and back pain as non-severe impairments. Plaintiff only mentioned the pain to Dr. Dubey, refused to provide further information about it to adjudicators, achieved at least 80 percent improvement with chiropractic treatment, and did not tell the ALJ it was a problem for him. (Tr. 149–51, 213, 238).

17

for himself, and engaged in such activities as going to the store and playing basketball. (Tr. 141, 28–29, 31–32, 36, 147–48, 162, 209, 213–15, 242–43). However, the ALJ accommodated a moderate impairment in concentration, persistence, and pace. (Tr. 12). Further, despite good relationships with family and friends and despite failing to report interpersonal problems to Dr. Dubey, the ALJ credited Plaintiff's testimony that he experienced difficulty getting along with people in a work setting by limiting him to only occasional interaction with the public, coworkers, and supervisors. (Tr. 11–12, 36–40).

Substantial evidence supports the RFC determination, and the VE testified a person with such limitations could perform many jobs existing in significant numbers. (Tr. 46–48). Moreover, even if the ALJ had limited him to only superficial interaction with others, Plaintiff still would have been able to perform many jobs. (Tr. 48). Plaintiff worked as an assembler from 1990 to 2005 and as a security guard in a nursing home from February 2007 to November 2008, and he did not leave his most recent position due to psychological conditions. (Tr. 142, 213). The ALJ aptly wondered whether Plaintiff would have continued to work if his position had not been eliminated, and Plaintiff's work history merely adds to the already-substantial evidence supporting the ALJ's conclusion finding Plaintiff not disabled.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court should find substantial evidence supports the Commissioner's decision denying SSI. The undersigned therefore recommends affirming the Commissioner's decision.

                                                  s/James R. Knepp, II
                                        United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of

Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).